15988

SANDERS v. GREATER GREENVILLE SEWER DIST. *ET AL.*
(44 S. E. (2d) 185)

144

*Mr. J. Wilbur Hicks,* of Greenville, for Appellant, cites:

*Mr. J. D. Todd, Jr.,* of Greenville, for Respondents, cites:

September 13, 1947.

OxNER, J.: The principal question to be determined on this appeal is whether under the statutes hereinafter mentioned the Overbrook Water and Sewer Sub-District may be extended and enlarged so as to include (1)) a certain area lying within the Greater Greenville Sewer District but not previously made a part of a sub-district, and (2) another area which lies entirely outside of the original boundaries of the Greater Greenville Sewer District.

In 1925 an act was passed creating as a "body politic" the "Greater Greenville Sewer District", consisting of the territory included in the Greenville School District and in the Parker School District, which was to be governed by a commission to be known as the "Greater Greenville Sewer District Commission". 34 St. at Large, p. 744. The district thus created embraces the territory within the City of Greenville and also a large industrial area and a thickly populated resi-

dential area surrounding the City. The population of these adjacent areas is as large if not larger than that of the City. The act creating the district was amended in 1926, 34 St. at Large, p. 1537, and the Commission empowered to establish and maintain water and sewer lines in the district, to purchase existing sewer lines, and "generally to do all things necessary for the purpose of creating and maintaining a sewerage system in said district adequate for the protection of health in said District and for the establishment of proper sanitary conditions therein". This amendment further provided: "That said Commission shall not spend any money for the establishment and construction of any lateral lines or construction of said system other than the trunk lines and disposal plant or plants, until such time or times as said Greater Greenville Sewer Commission has required the property owners in communities not now having laterals to make arrangements whereby cost and construction of said lateral lines shall have been assumed by such property owners". During the same year an act was passed, 34 St. at Large, p. 1540, empowering the Commission to issue bonds of the district in the sum of $3,000,000.00 and use the proceeds in establishing and maintaining said sewer system and directing that there should be levied annually on all property within the district a tax sufficient to pay the principal and interest on said bonds. The act further provided that the question of issuing said bonds should be submitted to the qualified electors of the district. An election was duly held which resulted in favor of the issuance of said bonds. Thereafter the bonds were sold and the Commission constructed trunk lines and a disposal plant.

In 1929 an act was passed providing for the division of the district into sub-districts. 36 St. at Large, p. 864. The Commission was directed to make a survey for the purpose of dividing all of said district into sub-districts and after doing so to form two classes: "Class (A)"—sub-districts which have lateral lines already installed, "Class (B)"—sub-districts which do not have lateral lines installed. As

to those sub-districts in Class (A), the Commission was
to take no action except to make the necessary regulations.
As to those in Class (B), the Commission was directed,
upon the filing of a petition by a certain number of free-
holders of the sub-district "asking that said Commission or-
der an election in said sub-district for the purpose of (a)
incorporating said sub-district, (b) allowing the sub-district
to issue bonds or certificates of indebtedness for an amount
necessary to install and maintain water and sewer lateral
lines therein and connect the same with the main trunk line
or lines, and (c) to provide for the levy of a tax in the sub-
district sufficient" to pay the principal and interest of said
bonds, to order an election in said sub-district upon the ques-
tions stated in the petition. Should the election result in favor
of the questions presented, the act provided that "the said
sub-district shall thereupon be and become a body politic
and corporate under the name of '—— Water and Sewer
Sub-District.' " The sub-district was to be governed by a
committee to be known as "—— Water and Sewer Sub-
District Committee". The committee of a sub-district so or-
ganized was empowered to establish, operate and maintain
water and sewer lines in the district, to purchase lateral
water and sewer lines already installed therein and "generally
to do all things necessary for the purpose of creating, main-
taining, and operating a water and sewer system in said
sub-district adequate for the protection of health in said dis-
trict, and for the establishment of proper sanitary conditions,
so far as they pertain to the operation of water and sewer
systems". All costs of installing lateral lines and of connect-
ing them with the main trunk lines were to be paid by the
sub-district. The commission of the master district was to
approve all plans and specifications for such lateral lines.
The Committee of the sub-district was authorized to issue
bonds of the sub-district in such sum as deemed necessary for
the purpose of constructing and maintaining the water and
sewer systems in the sub-district, the principal and interest
of which were to be paid by an annual tax levied on the

property within said sub-district. The Greater Greenville Sewer District Commission was authorized to purchase bonds issued by a sub-district. Provision was also made in this act for the incorporation into a sub-district of any area outside the limits of the Greater Greenville Sewer District and its annexation to the master district. The procedure to be followed was substantially the same as that followed in the incorporation of a Class B sub-district.

In 1933 the committee of any sub-district was further empowered "to furnish adequate fire protection for the district". 38 St. at Large, p. 898. In 1935 a method was provided whereby an area lying either within or without the Greater Greenville Sewer District could become a part of a sub-district already organized. 39 St. at Large, p. 890. During the latter part of 1935 the Overbrook Water and Sewer Sub-District was regularly created and organized under the terms of the acts heretofore mentioned. In 1936 an act was passed validating and ratifying the creation and establishment of the Overbrook Water and Sewer Sub-District. 39 St. at Large, p. 2335. The territory embraced in this sub-district is described in the act. This act further validated and ratified the issuance of $150,000.00 of bonds by this sub-district and "the levying of a tax for the payment of the principal and the interest of said bonds".

In 1941, the 1935 act providing a method of annexation to a sub-district was further amended and is now as follows (42 St. at Large, p. 978) :

"An area lying without the limits of Greater Greenville Sewer District may become incorporated therein and become a part of a sub-district already organized by the following procedure:

, "When the freeholders or residents of such area desire that it become a part of a sub-district, they shall cause to be filed with the Commission and the Committee of such sub-district a plat of the area and a petition signed by not less than one-third (1/3) of the freeholders therein, asking:

(1) That such area be incorporated into Greater Greenville Sewer District; (2) That it become a part of the named sub-district; (3) That water and/or sewer lines be installed and maintained therein and that it receive all other benefits provided for the sub-district; (4) To state the terms and conditions upon which the area may be incorporated into Greater Greenville Sewer District and the sub-district; (5) That a tax be levied sufficient to pay for these benefits as provided for by paragraph 3(c) of this Act; and (6) That these questions be submitted to the qualified electors of the area (if there be such electors) by an election to be called and held as provided by paragraph 3 of this Act; or the petition may ask that the questions be submitted to the qualified electors within the area (if there be any), without holding an election, by presenting to them a petition in writing for their signature of assent or dissent thereto. If the matter is to be presented by election it shall not be necessary to have the first petition signed by more than one-third (1/3) of the freeholders of the area; if it is submitted by petition instead of election, the first petition must be signed by a majority of such freeholders, who own fifty per cent (50%) or more of the lands in the area to be affected.

"If it be made to appear to the satisfaction of the Commission that there are no qualified electors in the area involved, the matter shall then be submitted to the freeholders of the area by petition properly drawn for that purpose.

"Upon receipt of the petition, the Commission and the Committee shall determine whether or not it is practical to install and maintain water and/or sewer lines, and to furnish the other benefits provided for the sub-district, in the area; and, if so, the Commission and the Commitee shall determine upon what terms and conditions said area may be admitted into Greater Greenville Sewer District and the sub-district. The Commission shall further determine whether or not there are qualified electors in the area and whether the circumstances require an election, or if a petition submitted to the electors would be more expedient and just.

If the matter is to be determined by an election, the Commission shall call and hold it as provided by Section 3 of this Act. The questions submitted to the electors shall be 1, 2, 3, 4 and 5, which must state clearly the terms and conditions prescribed by the Commission and the Committee. If the matter is to be determined by petition instead of election, the Commission shall prepare a petition containing questions 1, 2, 3, 4 and 5, as prescribed in case of election, and shall add thereto a notice that no election will be held but that the matter will be decided by this petition, and shall ask that the electors (or freeholders as the case may be) sign their names and in writing thereon indicate their assent or dissent to the questions submitted by answering 'Yes' or 'No' after their names. The Commission shall cause the petition to be circulated impartially and fairly amongst those qualified to sign it, as above provided, until not less than two-thirds (2/3) of the electors or freeholders have signed it.

"An area lying within Greater Greenville Sewer District may become a part of a sub-district by following the same procedure; except the language of petitions and questions submitted shall be so altered as to omit any reference to becoming a part of Greater Greenville Sewer District."

In 1941 the committee of any sub-district was further empowered "to pass regulations requiring owners of property to connect with the water and sewer systems when they are available, and such connection is, in the discretion of the Committee, necessary to protect the public health and/or security; to collect garbage in the district and to dispose of it as they find reasonable, * * *." 42 St. at Large, p. 980.

The Overbrook Water and Sewer Sub-District has now sold approximately $75,000.00 of the $150,000.00 in bonds authorized and used the proceeds in installing water and sewer lines in this sub-district. It is admitted that "this work has practically been completed, so that most of the area within the sub-district and all of it that now needs service, now has adequate water and sewer facilities".

When the Overbrook Water and Sewer Sub-District was organized there was an area on the eastern side thereof lying within the master district which was not included in this sub-district because it was too sparsely settled. This area has now become very thickly settled and desires water and sewer facilities. Adjoining this area and lying outside of the master district but adjacent thereto is another thickly populated area. During World War II the Government constructed water and sewer lines through both of these areas at a cost of approximately $125,000.00 which it has now offered to sell for $6,000.00. In accordance with the procedure outlined in the 1941 Act, all the freeholders of the two areas mentioned filed a petition with the Greater Greenville Sewer District Commission and the Committee of the Overbrook Water and Sewer Sub-District requesting (a) that the second area mentioned be incorporated into the Greater Greenville Sewer District; (b) that both areas be annexed to the Overbrook Sub-District; (c) that the Overbrook Water and Sewer Sub-District buy the water and sewer facilities from the Government for $6,000.00; and (d) that the two areas named be then taxed to pay for these facilities and maintenance costs and be required to pay the levy made for the support of the master district and that thereafter they be taxed in common with the master district and the Overbrook Sub-District for the purpose of maintaining and extending water and sewer facilities as developments require. The Commission of the master district and the Committee of the sub-district duly considered the petition and approved the annexation of the areas on the terms designated. It was further determined that the wishes of the electors in the areas involved be ascertained by a petition rather than an election. A petition was thereupon circulated among the electors of the areas involved and the proposed annexation was unanimously approved.

Shortly thereafter this action was instituted by a resident and taxpayer of the Overbrook Water and Sewer Sub-District for the purpose of having declared invalid the proposed

annexation and enjoining the Committee of said sub-district from issuing bonds to be used in buying the water and sewer lines from the Government. There is no dispute as to the facts. The matter was heard upon the pleadings by the County Judge of Greenville County who thereafter filed an order in which he held that the annexation was valid and refused to enjoin the issuance of the bonds.

Before entering into a discussion of the issues involved on this appeal, it may not be amiss to state that the acts heretofore reviewed have been previously considered by this Court on two occasions. The validity of the acts creating the Greater Greenville Sewer District and authorizing the issuance of bonds in the sum of $3,000,000.00 was upheld in *Rutledge v. Greater Greenville Sewer District et al.,* 139 S. C. 188, 137 S. E. 597, 600. The Court stated that "the Legislature had the authority to create Greater Greenville sewer district and authorize the levy of taxes therein based upon the special benefits received by the property owners therein". In *Floyd v. Parker Water and Sewer Sub-District et al.,* 203 S. C. 276, 17 S. E. (2d) 223, the right of one of these sub-districts to issue bonds for the purpose of extending and enlarging the water and sewer lines within the district, furnishing adequate fire protection and disposing of garbage, and to pay the principal and interest on such bonds by the levy of an *ad valorem* tax on the property within the district was sustained.

We now proceed to determine the questions raised by the exceptions.

Appellant asserts that the master district and sub-districts are special assessment districts which have sold bonds and used the proceeds in installing water and sewerage facilities and that the General Assembly is without power to extend their boundaries.

Statutory provisions permitting the extension of the boundaries of such districts are not uncommon. In fact, most of the statutes permitting the organization of drainage or

sewer districts make provisions for a subsequent extension to take in other lands.

The creation of a sewer district is an act of sovereignty. "There is no doubt that the legislature of a state may constitute drainage districts and define their boundaries, or may delegate such authority to local administrative bodies". *Myles Salt Co. v. Board of Commissioners et al.*, 239 U. S. 478, 36 S. Ct. 204, 205, 60 L. Ed. 392, L. R. A. 1918-E, 190. In *Dillon Catfish Drainage District v. Bank of Dillon*, 143 S. C. 178, 141 S. E. 274, 276, the Court held that "the Legislature has power to establish, either directly or indirectly, drainage districts and constitute them political divisions of the state for the convenient accomplishment of what must be regarded as an important governmental function" and had "authority to levy a drainage assessment upon all of the property of a district at a uniform rate according to its assessed value, or a tax according to acreage or location". In *Honey Creek Drainage District v. Farm City Investment Co.*, 326 Mo. 739, 32 S. W. (2d) 753, 757, the Court said: "Municipal corporations, such as drainage districts, are instrumentalities of government. Their creation involves an exercise of political and governmental power, as distinguished from judicial power. The legislature may therefore establish any such corporation, and extend its territorial boundaries after it is established, by means of any agency or agencies it deems appropriate".

In support of his contention that the Legislature is not empowered to extend the boundaries of either the master district or those of the sub-district, appellant principally relies on *O'Neal et al. v. Mann et al.*, 193 N. C. 153, 136 S. E. 379, 384. It is true that the Court stated in that case that the boundaries of the drainage district there involved could be "neither extended nor contracted by statute", but this statement was made under circumstances quite different from those now before us, both as to the nature of the district and the method authorized by statute for its formation. The drainage district in the *O'Neal case* was established in a ju-

dicial proceeding. The statute under which it was organized provided that no lands included in a drainage district, established under such proceedings, should be assessed for drainage tax unless the Court found that such lands would be benefited by the establishment of the district and that all lands so included, which the Court found would be benefited, should be assessed in proportion to the benefits received. The statute further authorized the Court to thereafter give relief to any landowner where experience had shown that his land was not benefited and upon a proper hearing to exclude such lands from the district. The North Carolina legislature passed an act excluding from a drainage district formed under this statute a tract of land which had been previously assessed by the Court for the benefits received. The other landowners whose assessments would be increased by the exclusion attacked the validity of this act. The Court held that the rights of all parties were finally adjudicated in the proceedings when the district was formed; that the matters determined in these procedings were *res judicata;* and that any lands assessed for benefits could only be excluded by a motion in the cause. It was further held that the proceeding for the establishment of a drainage district under this statute was not an administrative one; that the district as formed was not a "public or municipal corporation, functioning as a governmental agency, within a political subdivision of the state", but was a "quasi public corporation created for private benefit". It was accordingly determined that the Legislature was not empowered to deprive the landowners of rights acquired in the judicial proceeding when the district was formed.

There is quite a difference between the nature of the drainage district involved in the *O'Neal case* and that of the sewer districts here. The districts under consideration were not created for private benefit. While the property therein receives special benefits from the improvements made and the costs are paid by a tax in the nature of an assessment by those receiving such benefits, the districts were created by

the State in the exercise of its police power primarily in order to provide sanitary conditions and to protect the health of the people within the districts. The sanitary conditions in the thickly populated areas adjoining the master district and sub-districts are a matter of vital concern not only to the people within these areas but to those in these districts. Accordingly, provision was made by these statutes for the formation of these areas into sub-districts or their annexation to a sub-district already organized and the enlargement of the master district so as to take in such areas. The functions of the sub-districts have been enlarged so as to include garbage disposal and fire protection. All of these are essential governmental functions which are usually performed by a municipality. It was held in *Floyd v. Parker Water and Sewer Sub-District et al., supra* (203 S. C. 276, 17 S. E. (2d) 227), that one of these sub-districts is a municipal corporation with limited functions. The Court there said that it is "a corporation or agency endowed with limited corporate functions, but they are derived from the same source and exercised in substantially the same way as any other municipal corporation. It is an arm of government created by the Legislature for a specific public purpose,   *   *   *."

No good reason appears why the power vested in the Legislature to fix the boundaries or limits of a municipal corporation and subsequently annex or authorize the annexation of contiguous or other territory should not be exercised so as to provide for the extension and enlargement of the master district or a sub-district created under these statutes.

It was held in *Floyd v. Parker Water and Sewer Sub-District et al., supra,* that the powers of the Greater Greenville Sewer District could be enlarged so as to include the right to purchase bonds of a sub-district. The Court said: "If the Legislature had the power, as it did, to create Greater Greenville Sewer District, and to confer upon it its original powers, we see no reason why those powers might not be restricted or enlarged by the Legislature at any time". Upon

a like principle we think the Legislature is empowered to enlarge or authorize the enlargement of the area of a district.

It is suggested that the property owners of this sub-district became clothed with certain vested rights which would be impaired by the contemplated extension of the district. But when the State in the exercise of its police power creates such a district, it does not confer upon persons directly or indirectly affected thereby a property right to have the boundaries of such a district remain perpetually the same. Even as to an ordinary drainage district it was held in *Houck et al. v. Little River Drainage District,* 239 U. S. 254, 36 S. Ct. 58, 60 L. Ed. 266, that the charter of such district as a public corporation does not constitute a contract with its members that the laws it was created to administer will not be changed. Also see *Bodeman et al. v. First Addition to Rattle Snake Drainage District et al.,* 197 Wis. 261, 221 N. W. 864. When the Overbrook Sub-District was organized the landowners had constructive knowledge that the statute authorizing its creation also provided for the extension of such a sub-district.

The constitutionality of the method provided by the statute for the extension of a sub-district is challenged upon the ground that when a petition for annexation is filed with the committee of the sub-district and the commission of the master district, no provision is made whereby those affected by the extension are afforded an opportunity to be heard either on the question of annexation or upon the terms and conditions upon which it shall be granted.

Whether appellant has been denied due process of law or the equal protection of the laws as guaranteed by the 14th Amendment must be determined by the decisions of the Supreme Court of the United States. The applicable principles have been well established by that Court. Where the legislature itself has created a drainage, sewer, or other improvement district and fixed its area, the landowners included therein are not entitled to a hearing on the

question of whether their lands will be benefited. Prior inquiry by the legislative body is presumed and its finding is conclusive. *Chesbro v. Los Angeles County Flood Control District et al.,* 306 U. S. 459, 59 S. Ct. 622, 83 L. Ed. 921. And whether such a district is formed directly by the legislature or in an appropriate proceeding under its authority, "the legislature may itself fix the basis of taxation or assessment; that is, it may define the apportionment of the burden, and its action cannot be assailed under the 14th Amendment unless it is palpably arbitrary and a plain abuse". *Houck v. Little River Drainage District, supra* (239 U. S. 254, 36 S. Ct. 60). But "where the Legislature, instead of determining for itself what lands shall be included in a district or what lands will be benefited by the construction of a sewer submits the question to some board or other inferior tribunal with administrative or *quasi*-judicial authority, the inquiry becomes in its nature judicial in such a sense that property owners are entitled to a hearing or an opportunity to be heard before their lands are included". *Hancock et al. v. City of Muskogee,* 250 U. S. 454, 39 S. Ct. 528, 530, 63 L. Ed. 1081. Also see *Embree et al. v. Kansas City and Liberty Boulevard Road District et al.,* 240 U. S. 242, 36 S. Ct. 317, 60 L. Ed. 624; *Browning et al. v. Hooper et al.,* 269 U. S. 396, 46 S. Ct. 141, 70 L. Ed. 330.

Applying the foregoing principles to the statutes under consideration, where a new sub-district is formed or one already existing is enlarged, those owning property therein are not entitled to be heard as to the distribution of the cost of the sewer system among the different properties in the district. Respecting this the Legislature itself has fixed the basis of assessment and determined that the cost of these improvements should be borne by a uniform assessment on all the property within the district. It is therefore not necessary to determine whether one lot of land will be benefited more than another or to apportion the burden of the costs among the particular property owners. *Embree e al. v. Kansas City and Liberty Boulevard Road*

*District et al., supra; Hancock et al. v. City of Muskogee, supra.*

We are not called upon in this case to determine ██ whether some lot or tract of land in the areas annexed has been improperly included therein because it will not be benefited or whether the landowners in these areas are entitled to a hearing on the question of annexation. Appellant is not a citizen or freeholder of the areas annexed and, therefore, is not in a position to assert that those within the annexed areas were not accorded an opportunity for a hearing. It may not be amiss to add that all the electors and freeholders within the annexed areas signed the petition for annexation and consented to the terms fixed by the Committee and the Commission and therefore would be estopped to assert that they were not afforded an opportunity of a hearing. *Ballentine v. City of Columbia*, 132 S. C. 88, 129 S. E. 82.

It is only necessary on this appeal to determine ██ whether appellant has been given the right to be heard on the question of annexation and the terms and conditions on which it should be made. His interest is no different from that of any other resident and freeholder of the Overbrook Water and Sewer Sub-District. As heretofore pointed out, each of these sub-districts is a municipal corporation with limited functions. Its governing board is a committee which is appointed by the Governor upon recommendation of the legislative delegation. It represents the district in its various governmental functions. It is expressly empowered by the act, for and in behalf of the district, to "determine upon what terms and conditions" an area shall be annexed to a sub-district. The Commission likewise passes upon these terms and conditions for and in behalf of the master district. These two bodies have approved the terms and conditions upon which the areas in question have been annexed. Appellant has, therefore, been heard through his duly constituted representatives. We think the procedure outlined meets the requirements of due process of law. Of

course, if in fact it is made to appear that there was an arbitrary and unwarranted exercise by the Committee and Commission of the power vested in them, judicial relief will be accorded to the parties aggrieved. *Hancock et al. v. City of Muskogee, supra.* This brings us to the next question raised by appellant.

Are the terms and conditions fixed by the Committee and Commission in the instant case plainly arbitrary or unreasonably discriminatory? Appellant says that the people in the areas annexed will enjoy the benefits of improvements already made within the sub-district and master district without being required to pay a just proportion of the costs of such improvements. But we do not think that there is a manifest and unreasonable discrimination between the people within the original boundaries of these districts and those in the areas annexed. One of these areas was included within the original boundaries of the master district and for a number of years has been assessed for the support of the master district without enjoying any corresponding benefit. Neither area has heretofore enjoyed any benefit from the facilities of either the master or the sub-district. They will now do so but under the terms of the annexation are to be assessed to pay the costs of the sewer lines proposed to be purchased, the title to which will vest in the sub-district. They will also be assessed for the maintenance of both the sub-district and master district and for the payment of principal and interest on the outstanding bonds of the master district. The installation of a sewer system in the annexed areas will not only improve the sanitary conditions in this territory but will also result in the improvement of the sanitary conditions in the old sub-district. It seems to us that the terms are equitable and just to all concerned. But assuming that there is some difference in the receipt of benefits, due process of law does not require absolute equality. It was held in *Houck v. Little River Drainage District, supra,* and numerous subsequent cases that in levying assessments for local improvements there is no re-

quirement "that for every payment there must be an equal benefit".

While the bonds of the Overbrook Water and Sewer Sub-District are to be sold to provide funds with which to purchase the sewer lines from the Government, the principal and interest on these bonds will be paid from an assessment on the property of the annexed areas alone. Of course this results in a contingent liability being imposed on the entire sub-district. Such contingency, however, is highly remote as there is no reason to doubt that the assessment on the property in the annexed areas will be entirely sufficient to pay the principal and interest on these bonds. It would seem that the benefits heretofore mentioned accruing to the sub-district are entirely sufficient to warrant the imposition of this contingent liability.

It is further said that the bonds of the sub-district were authorized only for the purpose of establishing water and sewer systems within said district as originally created and could not be issued to pay for improvements made in the annexed areas. There is no merit in this suggestion. The annexed areas are now just as much a part of the sub-district as if they were originally included therein. For the same reason the contention that the master district cannot lawfully purchase the bonds issued by the Overbrook District to pay for these lines is untenable. See *Floyd v. Parker Water and Sewer Sub-District et al., supra.*

The validity of the annexation is further assailed upon the ground that the question was submitted to the areas to be annexed by an election petition instead of by a regular election by ballot. It is said that this procedure violated Article 1, Section 10, of the Constitution, requiring that "all elections shall be free and open", and Article 2, Section 1, requiring that "all elections by the people shall be by ballot". We do not think that this was an election within the contemplation of these constitutional provisions. *Martin v. School District,* 57 S. C. 125, 35 S. E.

517; *State ex rel. Harris et al. v. Hanson et al.,* 80 Neb. 738, 117 N. W. 412; Annotation, 14 L. R. A., N. S. 850.

It is further contended that the bonds to be issued for the payment of the cost of these water and sewer lines would be invalid because the question was not submitted to the qualified electors as provided by Article 8, Section 7, of the Constitution. This constitutional requirement does not apply to bonds issued by a specially created assessment district. The question was just recently before us in *Ashmore et al. v. Greater Greenville Sewer District et al.,* S. C. 44 S. E. (2d) 88.

It is said that the assessment within the annexed areas will be different from that in other portions of the sub-district which would violate Article 10, Section 1, and Article 8, Section 6, of the Constitution. The assessment before us is not a tax within the meaning of these constitutional provisions. 48 Am. Jur. page 613.

Finally it is contended that the assessment to be levied contravenes Article 10, Sections 5 and 6. The limitations contained in these sections do not apply to a special assessment district for local improvements. *Evans et al. v. Beattie et al.,* 137 S. C. 496, 135 S. E. 538; *Ashmore et al. v. Greater Greenville Sewer District et al., supra.*

Judgment affirmed.

BAKER, CJ., and FISHBURNE, STUKES, and TAYLOR, JJ., concur.